[Civ. No. 29759. Second Dist., Div. Three. Nov. 22, 1967.]

SHIRLEY ANN McMAHAN WILSON et al., Plaintiffs and Respondents, v. HIDDEN VALLEY MUNICIPAL WATER DISTRICT, Defendant and Appellant.

274

Robert J. North, Loeb & Loeb and Howard I. Friedman for Defendant and Appellant.

Cavalletto, Webster, Mullen & McCaughey, Robert O. Angle, J. B. Hudgens, Arthur A. Henzell, Gibson, Dunn & Crutcher and Samuel O. Pruitt, Jr., for Plaintiffs and Respondents.

COBEY, J.—This is an appeal by the Hidden Valley Municipal Water District from a judgment directing the issuance of a peremptory writ of mandate. The writ would order the District to set aside its decision of February 29, 1964, denying petitioners' petition for exclusion of their lands from the District and its decision of May 2, 1964, denying their petition for the District's consent to the annexation of the same lands to the Calleguas Municipal Water District and the Metropolitan Water District of Southern California. The writ would instead order the District to grant both petitions.

In 1955 and 1956 property owners within Hidden Valley in Ventura County, as an association, formulated a policy to preserve within the Valley its agricultural way of life.[1] In June 1960 they formed the District for the same purpose and more specifically to prevent the Valley from being included in the adjoining Calleguas Municipal Water District and in the Metropolitan Water District of Southern California. Practically all of the people owning land or living within the Valley thought then and apparently still think that if any part of the Valley becomes a part of these districts and a supplemental water supply is thereby made available to the Valley, it will be impossible to maintain their present agricultural way of life and subdivision and urbanization will inevitably follow. In furtherance of this policy the District following its formation initiated successful injunctive proceedings to prevent the annexation of its territory by the Calleguas

---

[1]The facts as to this policy of the association and District are stated much more explicitly in this opinion than in the testimony of various participants at the hearings. However, a reading of the record makes crystal clear that its import in this respect is accurately stated in this opinion. The present use of land within the Valley appears to be entirely agricultural holdings in various sizes and rural estates.

Municipal Water District. (See *Hidden Valley Municipal Water Dist.* v. *Calleguas Municipal Water Dist.*, 197 Cal.App. 2d 411 [17 Cal.Rptr. 416].)

The present largely ground-water supply of the District, including that for petitioners' land involved herein, is inadequate for the maximum agricultural development of the lands within the District. In 1961 only 237 acres of the 1,650 irrigable acres within the District were under irrigation. Petitioners, who own two of the larger ranches in the Valley, desire to acquire a supplemental water supply for these ranches so that they may fully irrigate them and thereby make their operation profitable. They proposed in the proceedings before the District's board of directors to exclude from the District, which now includes approximately 4,600 acres, some 1,230 acres. In terms of irrigable land, they would exclude or have annexed[2] 635 acres of the aforementioned 1,650 acres.

The trial court in its decision found, among other things, that each petition was denied after hearing by the board of directors of the District without any statement of reasons therefor; that the lands of petitioners proposed to be excluded or annexed did not receive any benefit (that is, water), from the operations of the District; that the District does not own and has made no attempt to obtain any water facilities and has no assets except a bank account; that it has never acquired any water rights and has never made any overt attempt to import water into the Valley; that it has never furnished water to the subject lands of the petitioners;[3] that the lands of petitioners proposed to be excluded or annexed do not have an adequate water supply and that the only feasible source of an adequate supplemental water supply for such lands is the two other previously mentioned districts, which would include such lands if they could; that the purpose and motive of the board of directors of the District in denying the two petitions was to prevent the importation of supplemental water for these lands and thereby to continue limiting

[2]Petitioners have made it clear that they prefer exclusion of these lands from the District. However, if exclusion is not granted, they then ask for the District's consent to the annexation of these lands to the Calleguas Municipal Water District and the Metropolitan Water District of Southern California.

[3]It has never furnished any water to any lands within the District and no request for water service to any of the lands within the District has ever been made to the board of directors.

the use of such lands to their present limited agricultural use; and that each of the District's directors[4] was biased and prejudiced against petitioners and each made up his mind to deny the two petitions before hearing them.

The trial court in its decision concluded, among other things, that as a matter of law, the board of directors of the District denied petitioners a fair hearing upon both petitions, acted without any substantial evidentiary support, arbitrarily, capriciously, in excess of its jurisdiction, fraudulently and discriminatorily against petitioners and that on the showing made by petitioners at the two hearings, they were entitled to decisions from the board granting each petition.

### The Type of Mandamus Involved.

Appellant District, in its answer to the two petitions for writ of mandate filed in the trial court, specifically alleged that the proceedings before its board of directors were "quasi-legislative in nature" and were not subject to judicial review by administrative mandamus. The petitions themselves do not disclose whether petitioners are seeking judicial review by administrative mandamus or by ordinary mandamus.[5] The trial court's decision is likewise silent on this point. Since the scope of judicial review under the two types of mandamus differs, the first question which must be answered in this opinion is: Under what type of mandamus did the trial court conduct its judicial review of the proceedings before the District's board of directors?

By the terms of Code of Civil Procedure, section 1094.5, administrative mandamus does not apply unless the final administrative order or decision reviewed was "made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in the inferior tribunal, corporation, board or officer. . . ."

Under the Municipal Water District Law of 1911 (Wat. Code, div. 20, § 71000 et seq.) no hearing is required when the board of directors of a district is determining whether to

---

[4]One of the petitioners is one of the five directors of the District, but she did not participate as a director in any of the proceedings under review.

[5]Our terminology is that used in Continuing Education of the Bar, California Administrative Mandamus (1966) xxiii, xix-xx, 21-22. See also, Kleps, *Certiorarified Mandamus Reviewed: The Courts and California Administrative Decisions—1949-1959* (1960) 12 Stan. L. Rev. 554, 555.

grant or withhold its consent to the annexation of a part of its territory by another water district. (See Wat. Code, former § 71033.) On the other hand, the District Law specifies that a hearing upon written protests by owners of property within the uninhabited land proposed to be excluded shall be held (see Wat. Code, former §§ 72250-72252) and if such protest is not made by the owners of one-half of the value of the territory proposed to be excluded, the board of directors of the district shall approve or disapprove the exclusion by ordinance. (Wat. Code, former § 72253.)[6]

Of course it can be argued that constitutional due process of law requires notice and hearing in the consent to annexation proceedings[7] and that the federal and state Constitutions are a part of the "law" referred to in section 1094.5 (cf. Evid. Code, § 160). But leaving this argument aside, in view of the absence of any express requirement for a hearing in the District Law, section 1094.5 cannot be invoked for the purpose of judicially reviewing the consent to annexation proceedings before the board of directors of the District. (See *Keeler* v. *Superior Court,* 46 Cal.2d 596, 599 [297 P.2d 967]; *Munns* v. *Sternman,* 152 Cal.App.2d 543, 556-557 [314 P.2d 67]; *Rich* v. *State Board of Optometry,* 235 Cal.App.2d 591, 602 [45 Cal. Rptr. 512].)

The situation with respect to the applicability of judicial review to the District's exclusion proceedings under section 1094.5 is, however, not so clear since here a hearing upon written protests was required by statute and though no findings as such were required by the District Law, that circumstance, in and of itself, apparently does not preclude the availability of this type of judicial review. (*Temescal Water Co.* v. *Department of Public Works,* 44 Cal.2d 90, 100-102 [280 P.2d 1].)

It is unnecessary, however, for us to decide whether the District's proceedings involved in this case were *formally* sufficient for review by administrative mandamus. Such judicial review is prevented, in our opinion, by another and more fundamental consideration. ▇▇▇ Section 1094.5 authorizes

<hr />

[6]The five former sections of the Water Code cited were repealed by the statute which enacted the District Reorganization Act of 1965 (Gov. Code, §§ 56000 et seq.; Stats. 1965, ch. 2043, § 460, p. 4747, § 465, p. 4747.) However, they apply to the instant proceedings which took place before the board of directors of the District in 1964.

[7]This position is of doubtful validity. (See *Yribarne* v. *County of San Bernardino,* 218 Cal.App.2d 369, 379 [32 Cal.Rptr. 847], hear. den.)

judicial review only of the exercise by an administrative agency of an adjudicatory or quasi-judicial function. The basis for the conclusion that such was the legislative intent is carefully and thoroughly developed in Justice Bray's opinion for the court in *Brock* v. *Superior Court*, 109 Cal.App.2d 594, at pp. 598-601 [241 P.2d 283], and need not be repeated here. Therefore, since we conclude below that the board was exercising quasi-legislative powers in passing upon the two petitions, the judicial review of such action made by the trial court in this case had to be made under ordinary mandamus (Code Civ. Proc., § 1085)[8] and not under administrative mandamus. (Code Civ. Proc., § 1094.5.)

## The Decisions Under Judicial Review Were Quasi-legislative In Character.

The cornerstone of this opinion is our conclusion that, in passing upon petitioners' two petitions for exclusion or annexation of certain of their lands within the District, the District's board of directors was exercising quasi-legislative powers rather than quasi-judicial powers. Fundamental to this conclusion is the proposition that legislative action encompasses more than law-making—because in acting upon these petitions, the board of directors plainly was not enacting legislation. But quasi-legislative bodies, like the Legislature itself, do far more than their primary function of law-making. This proposition is well-established. For example, they appropriate and borrow money for public purposes (see *Berkeley High School Dist.* v. *Coit*, 7 Cal.2d 132, 135, 137-138 [59 P.2d 992]); they decide when and where the power of eminent domain is to be exercised (see *Wulzen* v. *Board of Supervisors*, 101 Cal. 15, 21 [35 P. 353, 40 Am.St.Rep. 17]); they decide whether various civic improvements are to be made (see *Nickerson* v. *County of San Bernardino*, 179 Cal. 518, 522 [177 P. 465] (hospital); *Quinchard* v. *Board of Trustees*, 113 Cal. 664, 667, 671 [45 P. 856] (street improvement); and they grant franchises for various public purposes (see *Monarch Cablevision, Inc.* v. *City Council*, 239 Cal.App. 2d 206, 210 [48 Cal.Rptr. 550]; *Pacific Rock & Gravel Co.* v. *City of Upland*, 67 Cal.2d 666 [63 Cal.Rptr. 572, 433 P.2d 476]). Similarly, administrators decide whether to prepare and promulgate marketing orders (see *Brock* v.

[8]It is settled law that ordinary mandamus is available to secure judicial review of quasi-legislative acts. (*Brock* v. *Superior Court, supra,* 109 Cal. App.2d 594, 601-603.)

*Superior Court, supra,* 109 Cal.App.2d 594, 597-598) or milk stabilization plans (see *Ray* v. *Parker,* 15 Cal.2d 275, 284 [101 P.2d 665]) and upon the location of state highway routes. (See *Holloway* v. *Purcell,* 35 Cal.2d 220, 230-232 [217 P.2d 665].)[9] Hence the fact that in the subject proceedings the board was not enacting ordinances embodying rules and regulations does not make its actions any less quasi-legislative.

Nor does the presence of certain elements usually characteristic of the judicial process mean that the board's action was quasi-judicial. In this case the board of directors of the District, in denying petitioners' requests for exclusion or consent to annexation of certain of their lands within the District, acted in response to specific petitions, with regard to specific parties and after hearing evidence. In these respects the decisions made by the board and the procedure used in arriving at its decision embodied characteristics of the judicial process.

But these characteristics of the proceedings are not alien to the legislative process. Legislative bodies often act in response to specific petitions and with regard to specific parties. (See, *e.g., Richards* v. *City of Tustin,* 225 Cal.App.2d 97 [37 Cal. Rptr. 124] (deannexation proceeding); *Monarch Cablevision, Inc.* v. *City Council, supra,* 239 Cal.App.2d 206, 210 (franchise); *Pacific Rock & Gravel Co.* v. *City of Upland, supra,* 67 Cal.2d 666 (franchise).) Furthermore, the hearing process is not confined to the courts. The Legislature and administrators exercising quasi-legislative powers commonly resort to the hearing procedure to uncover, at last in part, the facts necessary to arrive at a sound and fair legislative decision. (See *Louisville & Nashville R. Co.* v. *Garrett,* 231 U.S. 298, 307 [58 L.Ed. 229, 240, 34 S.Ct. 48]; *City Council of the City of Santa Barbara* v. *Superior Court,* 179 Cal.App.2d 389, 393 [3 Cal.Rptr. 796].)[10] Hence the presence of certain characteristics common to the judicial process does not change the basically quasi-legislative nature of the subject proceedings.

The courts in the past have devised several general formulations to assist them in differentiating quasi-judicial

[9]See generally, Hart & Sacks, The Legal Process: Basic Problems in the Making and Application of Law (Tent. Ed., 1958) 722.

[10]See also *Prentis* v. *Atlantic Coast Line Co.,* 211 U.S. 210, 227 [53 L.Ed. 150, 159, 29 S.Ct. 67]. ("Most legislation is preceded by hearings and investigations.")

from quasi-legislative action. One such formulation is as follows: "The one determines what the law is, and what the rights of parties are, with reference to transactions already had; the other prescribes what the law shall be in future cases arising under it." (*People* v. *Oakland Board of Education*, 54 Cal. 375, 376; cf. *Wulzen* v. *Board of Supervisors, supra*, 101 Cal. 15, 24; *Prentis* v. *Atlantic Coast Line Co.*, 211 U.S. 210, 226 [53 L.Ed. 150, 158-159, 29 S.Ct. 67].) Another is that the one determines individual rights, while the other involves the exercise of a discretion governed by considerations of the public welfare. (See *Quinchard* v. *Board of Trustees, supra*, 113 Cal. 664, 669.) While such formulations may be helpful, they do not provide an answer in every case. The basic inquiry, in our opinion, must be into the nature of the *function* performed. (See *Pitts* v. *Perluss*, 58 Cal.2d 824, 834 [27 Cal.Rptr. 19, 377 P.2d 83].)

In passing upon the two petitions the board of directors of the District was not hearing them as a disinterested tribunal deciding merely the question of whether the lands directly and immediately affected, should in whole or in part, be excluded from the District or permitted to be annexed by other local public entities. The board hearing these petitions was the governing board of the District. (Wat. Code, § 71270.) As such, its dominant concern had to be the effect its actions would have not merely upon the interests of those owning or living upon the land immediately affected by the petitions,[11] but also upon the interests of the people owning or living upon the land within the remainder of the District.[12] If the board was to discharge properly and faithfully its responsibility as an elected board, representing and governing a constituency, it had to make its decisions with respect to these petitions in terms of what the various directors thought was in the best interests of their constituents as a whole.

What they were asked to do in these petitions was to exempt the petitioners and others within the immediately affected area covered by the petitions from a water policy long declared by the directors and well-known to all concerned, including petitioners, and one underlying the very formation and continua-

---

[11] Actually, within the area proposed to be excluded or annexed, of some 1,230 acres, the only written protest was filed by an owner of two small parcels, aggregating less than one acre.

[12] In line with this analysis, the action of the board, at least upon the exclusion petition, was apparently subject to referendum by the voters of the District. (See Wat. Code, § 71531.)

tion of the District itself. For the governing board, in this situation, far more was involved than the resolution simply of the private rights and interests of the petitioners and the other individuals immediately affected. This was not just a private controversy. It was a continuation of the struggle within the District between an overwhelming majority and a very small minority over the basic local governmental water policy. At stake was the continuing effectiveness of that policy, ultimately perhaps the very existence of the District itself, and the kind of life that would prevail within Hidden Valley. Certainly the petitions posed to the board fundamentally political questions and the board's decisions in response therefore represented an exercise by it of essentially quasi-legislative powers.[13]

This characterization of the nature of these decisions is entirely in accord with the one generally enunciated in the California cases dealing with boundary changes made by governing boards of local public entities where a standard controlling the board's discretion has not been imposed. (See *Richards* v. *City of Tustin, supra,* 225 Cal.App.2d 97, 100; *Wine* v. *Council of the City of Los Angeles,* 177 Cal.App.2d 157, 167 [2 Cal.Rptr. 94]; *People* v. *City of Palm Springs,* 51 Cal.2d 38, 45-46 [331 P.2d 4]; cf. *Yribarne* v. *County of San Bernardino,* 218 Cal.App.2d 369, 375 [32 Cal.Rptr. 847], hear. den.; *Peart* v. *Board of Supervisors,* 145 Cal.App.2d 8, 11-12 [301 P.2d 874]; *People* v. *City of Los Angeles,* 154 Cal. 220, 224-226 [97 P. 311].)

*This Characterization Is Unaffected*
*by the Other Circumstances Present.*

Petitioners attack the characterization of these actions as quasi-legislative and the application of this characterization to the District with three arguments. First, they assert that the doctrine of the just-cited cases does not apply here because this case involves a district of special and limited powers as contrasted with local public entities of general powers involved in those cases. Petitioners cite no authority for this argument and we have discovered none. ▪ The existence of general powers, as contrasted to limited powers on the part of the local public entity involved, appears to us

---

[13]Compare *People* v. *Oakland Board of Education, supra,* 54 Cal. 375, 377; *Quinchard* v. *Board of Trustees, supra,* 113 Cal. 664, 669-671.

282

to be a totally irrelevant consideration in determining the nature of the particular power exercised.

Furthermore, this argument ignores the case of *Yribarne* v. *County of San Bernardino, supra,* 218 Cal.App.2d 369, 375-378, hearing denied, where, in response to an attack upon the constitutionality of the Municipal Water District Law of 1911, the court reaffirmed its constitutionality and concluded, among other things, that municipal water districts are quasi-municipal corporations.

Petitioners next argue that since some form of benefit standard has been widely imposed by the Legislature upon exclusion proceedings of various types of water districts, one should be implied here. There is no question that such benefit standards have been widely imposed; and the imposition of such a standard has long been the rule rather than the exception. If a benefit standard were implied here, it would at least make the action of the board upon the exclusion petition a quasi-judicial action since then the board could not act upon the petition in accordance with its quasi-legislative discretion. Instead, it would be compelled to act quasi-judicially because its discretion would be governed exclusively by the standard or limitation imposed by the Legislature. (See *Albonico* v. *Madera Irr. Dist.,* 53 Cal.2d 735, 739-740 [3 Cal.Rptr. 343, 350 P.2d 95]; *Imperial Water Co.* v. *Board of Supervisors of Imperial County,* 162 Cal. 14, 17-19 [120 P. 780]; *San Diego Gas & Elec. Co.* v. *Sinclair,* 214 Cal.App.2d 778 [29 Cal.Rptr. 769].) But a benefit standard has not been invariably imposed and there is considerable variation in both language and meaning among the standards that have been imposed.[14] None was imposed by the Legislature here. Under these circumstances we do not believe that we should regard the omission of a benefit standard in the Municipal Water District Act of

[14]Before the enactment of the previously mentioned District Reorganization Act of 1965, Stats. 1965, ch. 2043, (Gov. Code §§ 56000 et seq.) irrigation districts had a general benefit standard in exclusion proceedings. (See Wat. Code, former § 26729, subd. (a).) County water districts had instead a standard of substantial and direct benefit. (Wat. Code, former § 32222, subd. (a).) The standard for California water districts was prescribed in terms of availability of water from the district's works for irrigation of the lands directly involved and the availability of alternate) sources of such water. (Wat. Code, former § 37329, subds. (a), (b), (c). Reclamation districts, on the other hand, had an explicit quasi-legislative standard of "the best interests of the district." (Wat. Code, former §§ 53634, 53635.) The procedure is very much different under the District Reorganization Act of 1965. (See generally, Gov. Code, § 56140 et seq. and §§ 56315, 56319, 56320 and 56321 in particular.)

1911 as inadvertent on the part of the Legislature. When the words of a statute are clear, a court ''should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.'' (*Estate of Simmons* (1966) 64 Cal.2d 217, 221 [49 Cal.Rptr. 369, 411 P.2d 97].)

Moreover, there is no more reason to imply a benefit standard in exclusion proceedings of municipal water districts than in the formation proceedings of such districts. In this connection, the following language of Justice Conley, speaking for the court, in *Yribarne* v. *County of San Bernardino*, *supra*, 218 Cal.App.2d 369, 374-376, hearing denied, is apposite and we quote at length: ''First, he contends that the Act is unconstitutional because there is no provision made in it for a preliminary determination by the board of supervisors as to whether the real property of the plaintiff will be benefited by its inclusion within the exterior boundaries of the proposed district.

''In view of the plenitude of the power of the Legislature, restricted only by the provisions of our state and federal Constitutions, it is not to be wondered that there exists considerable variety in the forms, and methods of creation, of the districts authorized by our laws. Certain types of districts require a preelection hearing and decision by the supervisors of a county in which the proposed district is to be located as to whether included lands will be benefited. Irrigation districts and reclamation districts are among those which so require; in such circumstances in order to comply with the basic provisions of the applicable statutes, such preliminary hearings must, of course, be held. (The Wright Act (Stats. 1887, ch. 34, p. 29); *In re Madera Irr. Dist.*, 92 Cal. 296 [28 P. 272, 675, 27 Am.St.Rep. 106, 14 L.R.A. 755]; *Fallbrook Irr. Dist.* v. *Bradley*, 164 U.S. 112 [41 L.Ed. 369, 17 S.Ct. 56]; Wat. Code, Reclamation Districts, div. 15.)

''Other districts provided for by our laws are limited in function to the making of specific improvements in a given area when the mere inclusion of the land of people living within the proposed district would subject them to the levy of assessments to pay for the work to be undertaken in accordance with benefits actually received by them. This type of organization, generally known as an assessment district, requires as an essential prerequisite to its formation a hearing on the question whether the lands included within its exterior

boundaries would be benefited by the formation of the district. (For example, see The Improvement Act of 1911, Sts. & Hy. Code, div. 7; Highway Lighting District Act, Sts. & Hy. Code, div. 14; Storm Drain Maintenance District Act, Deering's 'Water-Uncodified Acts,' 1962 (Pt. One) Act 2208; West's Wat. Code Ann.-App., § 42-1 et seq.; Pest Abatement District, Health & Saf. Code, div. 3.)

█ "But the Legislature has the rightful power also by general law to authorize the formation of a district such as is proposed here without any hearing preliminary to the election as to whether the land included will be benefited. This type of district has been termed a *quasi*-municipal district. It is formed for the purpose of supplying general municipal needs, although these needs may be specific in their delineated character; the creation of this type of district is not for the purpose of making a specific and narrowly limited improvement, but is comparable to the organization of a city; whatever assessments are made are, like taxes, general in nature and based on the valuation of the several parcels of land within the district. Not only does this classification apply to municipal water districts, but to many other districts whose purposes and general powers are defined by statute pursuant to article XI, section 19, of our state Constitution.

"The nature of the powers conferred upon municipal and *quasi*-municipal corporations and the territory included within such organizations are political questions to be determined in the discretion of the state, subject only to constitutional limitations; the solution of such questions rests with the Legislature.

"In *Morrison* v. *Smith Bros., Inc., supra,* 211 Cal. 36, at page 44 [293 P. 53], this type of district is thus characterized by the Supreme Court:

'Thus, from 1911 to date, there has been developed a new type of public corporation, resembling in many respects municipal corporations proper, and radically different in nature from irrigation and reclamation districts. The case of *Henshaw* v. *Foster, supra* [176 Cal. 507 (169 P. 82)] clearly recognized the distinction, holding that such *quasi*-municipal corporations were municipal corporations within the meaning of article XI, section 19, of the state Constitution.' "

█ Petitioners finally claim that even if the action was quasi-legislative the District is not entitled to the limitation

upon judicial review, which the application of this rule affords it. Their argument is essentially that the District is an illegal one, fraudulent in nature and organized in abuse of the power delegated by the Legislature to form and maintain local water districts, since the District's sole raison d'etre is to serve as an illegal regulator of land use or as an illegal zoning agency. These damning conclusions stem from the fact that the District does not provide and has not provided water for use within the District. We agree that a district of this type is normally formed and maintained for the purpose of bettering either the water supply or the water service, or both, within its boundaries and that this district has not done so and has no present plans for doing so. But in our view a water district may properly be formed and maintained for largely negative purposes as well as for positive purposes.[15] This district was quite evidently formed and has been maintained to prevent the importation of Metropolitan Water District water into Hidden Valley and the subdivision and urbanization of that Valley which the great majority of people within the Valley feel would then inevitably occur. We see nothing wrong in the use of a water district for this purpose. The people of Hidden Valley are using this local public entity to control and determine for themselves their own water future—in this case, for the present, negatively instead of positively. By the exercise of their right of political self-determination, they thereby, as an incident thereto, regulate the kind of land use that can prevail within the Valley.

Under the statute pursuant to which this District was created, it is now immune from attack upon the validity of its incorporation and the legality of its existence. (Wat. Code, § 71196.) Whether in view of the existence of this statute, *quo warranto* proceedings would lie, is not before us for decision at this time. If petitioners are of the opinion that the District's nonuser of its corporate powers warrants its dissolution, they may now pursue that course directly. (See Gov. Code, §§ 56173, 56174, 56140.) Again, they have not cited any

---

[15]According to its board of directors, the District stands ready to provide water within its boundaries whenever a general demand exists for such service. Furthermore the board is not opposed to the importation of a state-developed water as such; it is opposed only to its being imported through the Metropolitan Water District. However, at the present time there are apparently no immediate other prospects for the importation of either state-developed or federally-developed water into Hidden Valley.

law to support their argument upon this point and again we have found no law to support it. It is without merit.

## The Board's Actions Were Proper.

According to the statutory law applicable to these proceedings, the actions of the board of directors of the District upon these two petitions were governed solely by its quasi-legislative discretion as to what the directors thought was in the best interests of the District. In this situation judicial review by ordinary mandamus is limited to an examination of the proceedings before the board to determine whether its action has been arbitrary, capricious or entirely lacking in evidentiary support, or whether it has failed to follow the procedure and give the notice required by law. (*Pitts* v. *Perluss,* 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83].) No claim is made by petitioners in this case that the board did not follow the procedure specified in the Municipal Water District Law of 1911. In fact the board provided a hearing in the consent to annexation proceedings, which the law did not expressly require, and in the exclusion proceedings it provided a broader hearing than the law required. As indicated early in this opinion, the trial court found that the board did not state its reasons for denying the two petitions. But no statement was required by the law. The trial court also found that the lands proposed to be excluded or annexed were not receiving any water from the District. This was true, but in view of the nonapplicability of a benefit standard, such a finding was irrelevant. The same may be said of the District's inactivity in the field of water development and water distribution. The purpose and motive of the board in denying the petitions was, as the trial court found, to prevent petitioners from using the lands involved any differently from the way they were then using them, but such purpose and motivation was in accord with the fundamental policy underlying the formation and continued existence of the District and reflected the will of the great majority of those owning land or living within the District. This was to keep Metropolitan Water District water out of the Valley and thereby to prevent its subdivision and urbanization. Any claim of prejudgment, bias or prejudice in favor of this policy on the part of the four directors in acting upon the petitions is beside the point. Decisions of a governing board of a quasi-legislative character are expected to reflect the majority will

of its constituents on matters of quasi-legislative policy. This is the essence of representative government.

The trial court concluded as a matter of law that both hearings were unfair and that the board's decisions were objectionable on several grounds. As quasi-legislative hearings they were not unfair and, of course, such hearings are not governed by the requirements applicable to judicial or quasi-judicial proceedings. (*Franchise Tax Board* v. *Superior Court*, 36 Cal.2d 538, 549 [225 P.2d 905].) The quasi-legislative policy the board adhered to in its decisions against the petitioners did not discriminate against them as compared to the board's other constituents. The board merely refused to exempt petitioners from the District's fundamental water policy.[16] Consequently, the board's decisions upon the two petitions were not arbitrary, capricious or in excess of its jurisdiction.

 The trial court also concluded that these decisions were without substantial evidentiary support. In this conclusion the trial court erred.[17] There was evidence before the board establishing that the area sought to be excluded from the District or annexed to the other two districts constituted over 25 percent of the entire territory of the District and close to 40 percent of its irrigable land; that the loss of such a large proportion of District area and value would substantially reduce its tax base and adversely affect its bonding capacity;[18] that at the very least, a marked difference of opinion existed among landowners within the District as to whether the water proposed to be imported for use upon the lands of the petitioners would constitute a dependable and

---

[16]In *Richards* v. *City of Tustin, supra*, 225 Cal.App.2d 97, a property owner had his property taken into a city against his will because he thought that city would be unable to furnish his restaurant business with adequate sewage facilities. Then the property was kept within the city against his will though the city did not then and presumably could not furnish his restaurant business with adequate sewage facilities which he could obtain from an adjoining city if deannexation were permitted by the first city. It is true that another method of deannexation, not involving the first city's consent, was there possible; but here, the advent of the previously mentioned District Reorganization Act of 1965 provides petitioners with a new and different setting in which to seek to accomplish their objectives.

[17]We have stated the correct evidentiary standard earlier in this opinion.

[18]In case of annexation to the other two districts the area annexed would be part of more than the Hidden Valley Municipal Water District and therefore the bonding capacity of this particular area would be diluted.

feasible source of water for further agricultural development of those lands or whether instead, because of the comparatively high cost of such water and its priority for domestic purposes, such water would more likely be used domestically; that in any event the resulting greater development of the subject lands of petitioners would probably result in increased general property taxation of the remainder of the lands within the District, and that among the people living within Hidden Valley there was a widespread and rationally based fear that with the advent of Metropolitan Water District water within the Valley, subdivision and urbanization of the entire Valley would inevitably follow and the Valley's present limited agricultural way of life would be destroyed.

The judgment is reversed.

Ford, P. J., and Shinn, J.,* concurred.

Respondents' petition for a hearing by the Supreme Court was denied January 17, 1968.

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.